IN RE ESTATE OF JOEL SILKETT.

ELIZABETH M. SILKETT, Appellant, v. W. E. SILKETT, Administrator, et al., Appellees.

No. 39483.

DECEMBER 13, 1929.

*Swan, Martin & Martin* and *L. L. Orsborn*, for appellant.

*T. J. Hysham, Clifford Powell*, and *Ray M. Wardell*, for appellees.

EVANS, J.—Joel Silkett died on May 17, 1924, survived by the appellant, as his widow, and by five children and the only child of a deceased daughter. In short, he left surviving him six heirs. The decedent and the surviving spouse were married in December, 1921. The appellant had been married previously, and, at the time of her marriage to the decedent, had a son and a daughter, adult. The first wife of the decedent had died in the year 1917. His children were the fruit of the first marriage. At the time of his death, both the decedent and his wife were approximately 80 years of age. The funeral of the decedent occurred on May 19, 1924. Two members of the family were nonresident, and absent from the funeral. The decedent was a resident of Red Oak, in Montgomery County, where he died, and where his funeral occurred. After the funeral, and on the same day, those members of the family who were present, including the widow, appellant, and her adult daughter, went together to the office of Attorney Powell and conferred with him concerning the estate. A written contract was entered into at that time, and signed by the widow and such of the heirs as were present, whereby the widow was to receive an allowance of $100 per month and the statutory widow's allowance and the use of the homestead for life, free of rent and of taxes, and whereby she relinquished to the heirs all her interest in her husband's estate. It was understood that the contract should be deemed tentative until it should be signed by the absent heirs. Such signatures were obtained on June 14, 1924. The contract was carried out without controversy from that time until October, 1927, when it was repudiated by the appellant herein. The grounds of repudiation are various, and rather indefinite. They

are, in the main: That a fraud was perpetrated on the widow; that she was not advised of her rights; that the heirs and the attorney sustained a fiduciary relation with her; that they misled her and took advantage of her; and that the contract in its result was unconscionable. It appears that the property of the decedent consisted almost wholly of a bank deposit of $76,000, being the proceeds of the sale of his farm, and that the bank in which the deposit was made had closed its doors, whereby the value of such deposit became largely a matter of speculation. It further appears that efforts were in progress to reorganize the bank and to reopen it, and that this was accomplished on June 9, 1924; that, as a result of such reopening, a substantial part of the deposit was rescued, and became available as assets of the estate. It was stipulated at the trial that, if the court should hold that the appellant was entitled now to take her distributive share, the amount thereof would be the sum of $17,000 plus. The contention for the appellant in argument is that the attorney knew that negotiations for reopening the bank were in progress; that he knew it would be reopened; that he knew the deposit would attain substantial value; and that, by statement and advice, he misled the widow to her injury. It is contended also that the widow was taken advantage of by the haste with which the meeting was arranged, and that such meeting on the day of the funeral was unseemly, and indicated a purpose to take advantage of the widow in her affliction. Much argument is predicated upon the theory that a fiduciary relation of attorney and client existed between the widow and Attorney Powell, and between her and the heirs. We find no warrant in the record for this contention. So far as the attorney was concerned, he was a stranger to all the parties. They knew him only by reputation. He had never met any of them prior to that date. Earlier in the day, W. E. Silkett had called at his office and advised him that the family would call upon him in the afternoon for advice concerning estate matters. It does appear that there was a very distant relationship between the widow and the attorney Powell. Whether the fact was known at that time does not appear. It does appear that they had never previously met. The conference in the attorney's office was an open one, participated in by all the parties. The widow was advised that she had the right to appointment as administrator

unless she waived it. She expressed her desire for the appointment of W. E. Silkett (referred to in the record as Ed). She signed an application for his appointment. The contention that the heirs and Powell knew at that time that the bank would be reorganized and that the deposit would be restored, is without merit, upon this record. The receiver then in charge of the bank was a witness upon the trial, and testified to the condition of the bank and to the difficulties in the way of a reorganization. The capital of the bank was $60,000. It had worthless paper of more than $100,000 and doubtful paper of more than $200,000. Its president was himself insolvent, and the bank was ultimately held chargeable for more than $50,000 of his indebtedness. In order to reorganize and reopen the bank, it was requisite that all stockholders should pay an additional sum of $100 per share of their stock; that new stock should be sold at $200 per share, to the amount of $180,000; that the consent of all creditors should be obtained. The first actual step in the direction of such reorganization was had on May 20th. It was accomplished by June 9th. Of the new stock subscribed, $20,000 thereof was previously subscribed by Joel Silkett, to be paid out of his deposit. The Silkett estate did save, through the reorganization, a substantial part of their deposit. The uncertainty on May 19th as to what might ever be received out of that deposit was a reality, and not a pretense. The record does not justify any claim of false representation predicated upon forebodings as to the extent of loss to be suffered from the bank failure.

The relations between these heirs and the widow had at all times been kindly. In that sense, the widow undoubtedly trusted her stepsons. The record is too voluminous for detailed discussion. We have read it carefully. The appellant herself was a witness in her own behalf, and testified with commendable candor. The record discloses, and her testimony confirms it, that she was an intelligent person, well versed in the ordinary affairs of life, and with an active mentality at the time of the transaction, as well as at the time of the trial. In her early days she was a school-teacher. The record discloses her as a woman of kindly character. It shows also that her motives were influenced by her sense of her duty toward the children of her husband. It is undisputed that she expressed it as her

desire that the estate of her husband should ultimately go to his children; that she desired only a comfortable living therefrom during her life. The amount provided for in the contract was accepted by her voluntarily, and with full appreciation of what she was doing. This continued to be her attitude of mind until August, 1927, when she took offense at a certain remark made by W. E. Silkett, and contained in a letter. Some negotiations were begun about that time for amortizing or commuting her monthly payments, and a lump sum of $5,000 was offered to her. This was rejected, and it was in this connection that offense was given to her. The following quotation from her testimony furnishes as good a résumé of the record and the proper conclusions to be drawn therefrom as could well be made in small compass:

"I read the contract over before I signed it. It was satisfactory because I didn't care what they gave me, because I wasn't in a condition to care. I was satisfied with receiving $100 a month and the use of the house during my life, and would be satisfied with it now, if they left me alone. I became dissatisfied quite recently, when they began to talk about settling up for a lump sum. In other words, they wanted to give me a certain amount of money and let that take the place of the contract, and they wanted to give me as little as possible. They wanted to give me $5,000 and the house, while I chose to live in it; but I did not want to do this. This was in August of 1927. I was satisfied with the contract from the time I signed it, on the 19th of May, 1924, up until August, 1927, when they wanted to change it. I would not be satisfied with the contract now if they left it as it is, because in that contract they say, 'while the funds are available;' and Ed Silkett was getting away with the funds just as fast as he could, and I didn't know whether there would be anything left. That was the objection. I don't think it would be fair now, after this litigation has been started, for the court to fix it so that, regardless of Ed Silkett or anyone else, I would be assured of getting the hundred dollars a month and the use of the house while I live, and have the taxes paid. I should have never made any fuss about it if they hadn't wanted to change the contract. They wanted to give me $5,000 in a lump sum and the use of the house as long as I stayed in it, and change the contract. If I had gone away, as

I did when I went to California, they would have come in and took possession of the house. I have drawn my hundred dollars a month regularly since the signing of this contract on the 19th day of May, 1924, but the money wasn't paid regularly. Sometimes it was paid the first of the month, sometimes the middle of the month. There was a discrepancy between Mr. Silkett and I,—I thought they had paid me a hundred dollars less than they had it, and I asked him to produce the vouchers; but I haven't seen them; but of course this is merely a matter of adding up the figures. If I did not receive this $100, it is the only money which I am supposed to receive monthly that I haven't received. If they had continued carrying out this arrangement, it would have been satisfactory to me. I naturally supposed they were paying this money out of the estate. I knew all the time that the Silkett estate was not composed of anything except this deposit in the Farmers National Bank, this land, and the coal stock. * * * It was satisfactory until they sprung this other contract; and after the contract was drawn up, they sprung it on me, and wanted the furniture in the house, and then I didn't sign it. This was in August of this year. I don't think it was fair for them to attempt to change the contract into a lump sum. After our disagreement, they continued to pay me the $100 a month, and I am still drawing $100 a month under the old contract, and still occupying the house. I am not paying the taxes,—I suppose they are.''

It will be seen from the foregoing that the fact that this contract was drawn within such a short time following the funeral has no materiality. If, after sufficient time to reflect upon it, she had repented the contract and had sought to avoid it, a different question would be presented. But it appears herefrom that, after reflection, she was at all times satisfied. She acted willingly, pursuant to the contract, for 40 months, and received her monthly installments and occupied her tax-free home without any complaint, and even without dissatisfaction on her own part. She does not claim that any facts were concealed from her. She ratified the contract repeatedly every time that she accepted payment thereunder, with knowledge of the facts. The more important fact stressed in the argument is that the reorganization of the bank put a different value upon her distributive share. But she knew that fact when it occurred,

as fully as the heirs knew thereof. The contract was still open and unsigned by the absent heirs at that time, June 9th. She could have objected then, but she did not. The reason therefor is explained in her testimony. She was satisfied.

The record is too voluminous to warrant our incorporating its details in an opinion. Its careful consideration brings us to the firm conclusion that no fraud or wrong of any kind was perpetrated on the appellant; that, under the circumstances actually existing at the time of the contract, the provision made for her by the contract could have been greatly advantageous to her financially; that, in any event, she bargained for a certainty, as against a grave uncertainty; and that her future comfort was thereby assured; that she herself acted intelligently and advisedly; that her adult daughter was present with her at the time; and that her adult son visited her on May 28th, and learned all the details of the contract, though it is complained because he did not see a copy of it. Her expectancy of life at 80 years has already been passed since the contract was entered into. For the period of that expectancy, she has at all times taken the benefit of her contract. The reason given by her for repudiating her contract because of the friction that developed between her and the administrator in July or August, 1927, furnishes no proper basis for repudiation. The relief prayed for must, therefore, be denied.

The argument for appellant has laid special stress upon the alleged misconduct and bad faith of the attorney in inducing the contract. If the attorney had been guilty of the conduct charged in the argument, it would merit our later consideration, after the termination of the litigation. We deem it our duty to say with some emphasis that the charges thus made in argument have no fair justification in the record.

The district court properly denied the relief, and its decree is, accordingly,—*Affirmed.*

ALBERT, C. J., and FAVILLE, KINDIG, and GRIMM, JJ., concur.